IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | | |
|---|---|---|
| TANYA LYONS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 4:17-cv-01455 |
| | § | |
| KATY INDEPENDENT SCHOOL | § | |
| DISTRICT | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Christopher B. Gilbert
State Bar No. 00787535
Southern District No. 17283
Attorney-in-Charge

**THOMPSON & HORTON LLP**
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone:      (713) 554-6744
Fax:               (713) 583-7698
cgilbert@thompsonhorton.com

**ATTORNEYS FOR DEFENDANT KATY ISD**

**OF COUNSEL:**

Benjamin P. Wells
State Bar No. 24093341
Southern District No. 2714226
**THOMPSON & HORTON LLP**
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, Texas 77027
Telephone:      (713) 554-6751
bwells@thompsonhorton.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INDEX OF EXHIBITS........................................................................................ vi

I.  NATURE OF THE CASE ...............................................................................1

II.  FACTUAL BACKGROUND ..........................................................................1

III.  SUMMARY JUDGMENT STANDARD .........................................................10

IV. ARGUMENTS AND AUTHORITIES ...........................................................10

      A.       No Evidence of Disability Discrimination under the ADA ..................................10

      B.       No Retaliation under the ADA ...................................................17

      C.       No Hostile Environment under the ADA ...........................................24

V.  CONCLUSION ...........................................................................................25

CERTIFICATE OF SERVICE ...........................................................................26

## TABLE OF AUTHORITIES

**Page**

*Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422 (4th Cir. 2015) ........................................17

*Alvarado v. Texas Rangers*, 492 F.3d 605 (5th Cir. 2007) ...........................................................16

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ..................................................................10

*Aryain v. Wal-Mart Stores*, 534 F.3d 473 (5th Cir. 2008) ...........................................................23

*Balakrishnan v. Bd. of Supervisors,* 2011 WL 6003312 (5th Cir. 2011) ......................................19

*Bennett v. Calabrian Chems. Corp.,* 324 F.Supp.2d 815 (E.D. Tex. 2004) ................................17

*Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577 (S.D. Tex. 2015) ...............................21

*Burlington Northern and Santa Fe Railway Co. v. White,* 548 U.S. 53,
126 S.Ct. 2405 (2006) ........................................................................................17, 18, 23

*Burnside v. Kaelin*, 773 F.3d 624 (5th Cir. 2014) ........................................................................16

*Cabrol v. Town of Youngsville*, 106 F.3d 101 (5th Cir. 1997) ......................................................19

*Carmona v. Southwest Airlines Co.,* 604 F.3d 848 (5th Cir. 2010) .............................................11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................10

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123 S.Ct. 1673 (2003) ...............14

*DeHart v. Baker Hughes Oilfield Operations*, 214 Fed.Appx. 437 (5th Cir. 2007) .....................20

*Earle v. Aramark Corp.*, 247 Fed.Appx. 519 (5th Cir. 2007) ......................................................20

*EEOC v. Chevron Phillips Chemical Co., LP,* 570 F.3d 606 (5th Cir. 2009) ..............................10

*EEOC v. Res. for Human Dev., Inc.*, 827 F.Supp.2d 688 (E.D. La. 2011) .............................14, 15

*EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436 (6th Cir. 2006) ..............................................12

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229 (5th Cir. 2001) .....................................24

*Forsyth v. City of Dallas, Tex.*, 91 F.3d 769 (5th Cir. 1996) .......................................................16

*Francis v. City of Meriden*, 129 F.3d 281 (2d Cir. 1997) ............................................................12

## TABLE OF AUTHORITIES (cont.)

**Page**

*Grice v. FMC Techs. Inc.*, 216 F. App'x 401 (5th Cir. 2007) ......................................20

*Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180 (4th Cir. 2004) ..........................23

*King v. Louisiana*, 294 Fed.Appx. 77 (5th Cir. 2008) ..................................................23

*Lescoe v. Penn. Dept. of Corrections*, 464 Fed.Appx. 50 (3d Cir. 2012)......................13

*Lucero v. Nettle Creek School Corp.*, 566 F.3d 720 (7th Cir. 2009) ............................19

*Mann v. Louisiana High School Athletic Association,*
    2013 WL 2475116 (5th Cir., July 11, 2013)..................................................... 15

*Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261 (4th Cir. 2001) ...........................23

*McCollum v. Livingston*, 2017 WL 608665 (S.D. Tex. 2017) ...........................13, 14, 15

*McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558 (5th Cir. 1998) ..................24

*Mitchell v. Vanderbilt Univ.*, 389 F.3d 177 (6th Cir. 2004) ......................................21

*Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016) ....................12, 13, 14, 15

*Pegram v. Honeywell, Inc.*, 361 F.3d 272 (5th Cir. 2004) ...........................................16

*Penny v. United Parcel Serv.,* 128 F.3d 408 (6th Cir. 1997) .......................................17

*Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) .......................................................10

*Richardson v. Chicago Transit Auth.*, 292 F.Supp.3d 810 (N.D. Ill. 2017) .........................13, 14

*Serna v. City of San Antonio,* 244 F.3d 479 (5th Cir. 2001) ........................................16

*Shell v. Burlington Northern Santa Fe R.R. Co.*, 2018 WL 1156249 (N.D. Ill. 2018) ................13

*Sherrod v. American Airlines, Inc.*, 132 F.3d 1112 (5th Cir. 1998) .............................19

*Soublet v. Louisiana Tax Com'n*, 766 F.Supp.2d 723 (E.D. La. 2011) .........................23

*Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321 (5th Cir. 2009) ..........................23

## TABLE OF AUTHORITIES (cont.)

**Page**

*Szeinbach v. Ohio State Univ.*, 758 F. Supp. 2d 448 (S.D. Ohio 2010),
    *aff'd in relevant part,* 493 F. App'x 690 (6th Cir. 2012) ...................................................21

*Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556 (2d Cir. 2011) .........................21

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992) ....................................................................10

*Valtierra v. Medtronic Inc.*, 232 F.Supp.3d 1117 (D. Ariz. 2017) ................................................13

*Walker v. Geithner*, 400 Fed.Appx. 914 (5th Cir. 2010) ..............................................................19

*Watters v. Montgomery County Emer. Comm. Dist.*, 129 F.3d 610 (5th Cir. 1997) ...................12

*Weems v. Dallas Indep. Sch. Dist.*, 260 F.Supp.3d 719 (2017) ...................................................15

## <u>INDEX OF EXHIBITS</u>

The following exhibits are attached to Defendant's Motion for Summary Judgment, and are herein incorporated for all purposes:

Exhibit A:    Deposition Transcript of Tanya Lyons;

Exhibit B:    Declaration of David Paz;

Exhibit C:    Response to Defendant's Interrogatories;

Exhibit D:    Transcript of July 21, 2014 Voicemail;

Exhibit E:    July 30, 2014 email from DeForke;

Exhibit F:    Lyons text re volleyball;

Exhibit G:    August 12, 2014 email from DeForke;

Exhibit H:    First Set of Emails (Lyons9);

Exhibit I:    Second Set of Emails (Lyons10)

Exhibit J:    Third Set of Emails (Lyons11)

Exhibit K:    Third Set of Emails (Lyons12)

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | | |
|---|---|---|
| TANYA LYONS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 4:17-cv-01455 |
| | § | |
| KATY INDEPENDENT SCHOOL | § | |
| DISTRICT | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THE COURT:

Defendant Katy Independent School District ("KISD," or the "District") files its Motion for Summary Judgment, as follows:

## I.  NATURE OF THE CASE

Plaintiff Tanya Lyons was a Physical Education teacher at Mayde Creek Junior High School ("MCJH") during the 2013-2014 school year, who also coached girls' volleyball and track. Plaintiff claims that her reassignment during the summer of 2014 to running the In School Suspension ("ISS") program was disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA") , and complains about various subsequent changes to her ISS program and coaching duties that she claims were "retaliatory" under the ADA (although, as will be shown, she does not claim they were retaliation for complaining about discrimination). The District denies that the Plaintiff was discriminated or retaliated against in any way, and now moves for summary judgment on ALL claims.

## II.  FACTUAL BACKGROUND

Tanya Lyons started at Mayde Creek Junior High ("MCJH") in Defendant Katy

Independent School District for the 2007-2008 school year teaching girl's physical education ("PE"). (Ex. A, p. 14.) Although Lyons usually coached 3 sports per year (track, volleyball, and basketball) during her time at MCJH, during the 2013-2014 school year she only coached volleyball and track. (*Id*. at 15, 41; Ex. B, ¶ 1.) At some point in March 2014, Assistant Athletic Coordinator Lauren DeForke told all of the female PE teachers that all PE teachers were going to need to coach 3 sports for the upcoming 2014-2015 school year, at the instruction of new principal Dr. David Paz. (Ex. A, pp. 46-47; 49-50.) Dr. Paz wanted all of the PE teachers to coach 3 sports, so that the non-PE teachers who also coached could coach fewer sports, and thereby have more after-school time to focus on academic tutorials for students. (Ex. A, pp. 51-52; Ex. B, ¶ 2.) Lyons wanted to hear this from Dr. Paz himself, and so she scheduled a meeting with him on April 2, 2014, which was the first time she had ever really talked to the new principal alone. (Ex. A, pp. 50, 57; Ex. B, ¶ 3.) Dr. Paz confirmed that he wanted all of the PE teachers to coach 3 sports, to help free up the academic teachers. (Ex. A, pp. 51-52; Ex. B, ¶ 3.) Lyons admits that while she told Paz that she was willing to coach 3 sports, she also told him that she liked coaching 2 sports, and in particular not having to coach basketball, which was the "middle" sport of her year and stretched over the winter break. (Ex. A, pp. 52-53; Ex. B, ¶ 4.)

Around mid-March 2014 (spring break), the In School Suspension ("ISS") teacher at MCJH (Amberlyn Keller) resigned. (Ex. A, p. 89; Ex. B, ¶ 5.) During a conversation between DeForke and Dr. Paz, DeForke suggested Lyons for the position, because DeForke was aware that Lyons had previous ISS experience. (Ex. B, ¶ 5.) Paz considered Lyons, but ultimately decided to go with Mike Smith, because he thought his personality was a good fit for the position. (*Id*.) However, on July 15, 2014, Paz unexpectedly received a letter of resignation from Smith, so he needed to find a new ISS teacher on short notice. (Ex. B, ¶ 6.) Paz liked the idea of using a coach for the ISS position, because the coaches know a lot of the students and that hopefully would be a

deterrent to prevent students from misbehaving and being assigned to the ISS program.  (*Id*.)  Paz also knew that finding anyone experienced from outside the school  in mid-July would be difficult, because anyone under contract at surrounding school districts would be unable to get out of those contracts without approval of their school boards.[1]  (*Id*.)  He decided that if he needed to hire a new, inexperienced teacher, he would rather have that person be a PE teacher, since the PE teachers tended to teach as a group, and a new teacher would be able to observe and learn from the other, experienced PE teachers.  (*Id*.)  On the other hand, the ISS teacher was a more solitary position, and would need experience.  Because the ISS teacher would need to coordinate with academic teachers to get assignments for students assigned to ISS, already being familiar with the other teachers and students at MCJH would be a plus.  (*Id*.)  During a conversation between DeForke and Paz on July 15, 2014, she again reminded Paz that Lyons already had ISS experience, and Paz decided that Lyons was his best fit for that position.  (Ex. B, ¶ 7.)  Paz also knew that by changing Lyons' teaching assignment from PE to ISS, he would be able to honor Lyons' expressed preference during their April 2, 104 meeting to only coach 2 sports.  (*Id*.)

Because Dr. Paz needed to post the PE position quickly to try to find someone before the impending start of the school year, and because he did not want Lyons to learn about her reassignment by seeing her old position posted online, or finding out the first day of school when she returned, Paz called Lyons to talk to her about the reassignment on July 21, 2018.  (Ex. B, ¶ 10.)  She did not answer her cellphone, so Dr. Paz left the following voicemail:

> Tanya, this is David Paz.  I wanted to talk to you, there was a resignation today in ISS, and I know you've been having some health concerns, and so, with that, and knowing that you have ISS…um, you have ISS experience, I really like the idea of having a coach in ISS, um, helping to actually make it an effective deterrent, and then, with our classroom

---

[1] Dr. Paz was legally correct; under Texas law, a teacher may resign a contract without penalty at the end of a school year by filing a written resignation at any time up until the 45th day prior to the first day of instruction of the following school year.  *See* TEX. EDUC. CODE § 21.210(a).  The "penalty-free resignation deadline" tends to fall around mid-July most years.  Resignations at any other time of the year require the consent of the school board.  *Id*. at § 21.210(b).

management.

> So what I'm going to do is, I'm going to be changing your, um, changing your assignment to be the ISS teacher. Um, I'm also going to, this opens up the, um, opens up that position in PE, and what I can do is find somebody for basketball, so that you don't have to do the basketball. I know that's something you weren't looking forward to. So this hopefully will be good news as well, taking you out of that basketball position.

> Um, if you have any questions, give me a call. I will be off campus probably about an hour, for the rest of the day I'll be at the ESC. I will be here tomorrow, if you want to give me a call, or shoot me an email, or stop by. And also, let me know how everything is going. I know you had your procedure, make sure that everything is good. Make sure that you get all the support you need for the beginning of the year. Alright? Have a good day.

(Ex. A, pp. 63-64; Ex. B, ¶ 10; Exhibit D.) Paz has testified that although he was aware that Lyons had had some form of surgery over the summer, he did not know any of the details of the procedure, and the procedure did not in any way motivate his decision to reassign her to the ISS position. (Ex. B, ¶ 8, 9, 11.) However, he felt that out of politeness he needed to ask how she was doing, and he pointed out that the reassignment might help Lyons with any recovery that she might be going through, in an effort to help Lyons find a positive benefit to the change in position that was going to happen anyway.[2] (*Id.*)

On July 28, 2014, Lyons emailed Dr. Paz to express concerns both about her ability to actually do the ISS job, and that Dr. Paz was reassigning her because of "health concerns." (Ex. A, pp. 65-67; Ex. B, ¶ 12.) Dr. Paz immediately responded back, and with regards to the issue of her health, he stated:

> I think you misunderstood my voicemail regarding your health and procedures [sic]. To clarify, I had received your voicemail and was hoping you were doing well with your recovery. While this move could help with any recovery you may be going through, it was not a determining factor for moving you to ISS. Overall, your discipline management is effective, and as an established coach, I need your help in providing a productive system in ISS to minimize repeat offenders.

(Ex. B, ¶ 12; Ex. B-1.) Lyons filed a grievance over her reassignment (Ex. A, p. 87; Ex. B, ¶ 13),

---

[2] Lyons admits that just a few days before Dr. Paz called her, she had called him and left a message that she was not going to be able to attend a summer training session because of her doctor's restrictions. (Ex. A, pp. 58-59.)

---

and during the fall of 2014, Dr. Paz twice apologized to Lyons for any misleading impression she had received by his raising both the reassignment and her procedure in the same voicemail.  (Ex. A, pp. 97-98; Ex. B, ¶ 13; Ex. B-1.)  At the Level Two hearing before Assistant Superintendent for Human Resources Yolanda Edmond, Dr. Paz said:

> With that voicemail, I acknowledged and I can see where you would feel discriminated against and that was not my intention at all. What happened was, I put two conversations into one message, where it should have been two - should have been calling you and talking to you about the procedure and making sure everything was OK and then calling you and talking to you about the assignment.

(Ex. A, pp 98-99; Ex. B-3.)  However, Lyons informed Edmond that she was happy in the ISS position, and did not want to move back to teaching PE:

> [T]hings have been going great, we have been communicating great … I don't want to transfer anywhere right now … at this time, I do not wish to be moved anywhere. I'm happy with what's going on, I'm happy with where I'm at.

(Ex. A, pp. 91-92; Ex. B-3.)  Accordingly, Edmond denied the request to move back to PE as moot, but granted the following requested relief:

- • Working in a non-hostile, non-harassing environment at MCJH
- • No retaliation for filing this complaint
- • Working in an environment of professionalism and respect
- • Protect and respect privacy of all staff.

(Ex. B, ¶ 15; Ex. B-3.)

Lyons remained in the ISS position for the 2014-2015 school year, and was generally very successful.  (Ex. B, ¶ 16.)  However, there were some minor issues that arose.  (*Id.*)  As noted above, Lauren DeForke was the Assistant Athletic Coordinator for Girls Sports at MCJH, and Lyons admits that she and DeForke have had a contentious relationship that goes back to at least the 2011 season, when DeForke was substituting at MCJH for a teacher on maternity leave and, in the words of Lyons, tried to take over the program from Lyons, who at the time was interim Assistant Athletic Coordinator.  (Ex. A, pp. 22-28.)  According to Lyons, DeForke became a

"dictator," and always wanted things her way.  (*Id.* at 23.)  When DeForke became Assistant Athletic Coordinator for the 2013-2014 school year, she and Lyons got into a big dispute over how the girls on the 7C volleyball team should serve:  whether underhand, as Lyons believed Katy ISD policy required, or overhand, because DeForke wanted to hold them to a higher standard.  (*Id.* at 38-45.)  DeForke also did not like the fact that Lyons was only coaching 2 sports.  (*Id.* at 45-46.)

Lyons believes that much of DeForke's antagonism towards her stemmed from these disputes, all of which took place before Lyons had the surgical procedure at the beginning of the summer of 2014.  (Ex. A, pp. 38-46; 114-15.)  When Dr. Paz reassigned Lyons to ISS, in part to accommodate what he thought was her desire to keep coaching two sports, he told DeForke to give Lyons two sports (as she had had the previous year), but otherwise left it to DeForke to decide which sports each teacher got to coach.  (Ex. B, ¶ 7.)  On July 30, 2014, DeForke sent out a list to all female teachers of what they would be coaching, and listed Lyons as coaching basketball and track.  (Ex. A, p. 114; Ex. E.)  The email stated, "If you would like to be taken out of something please let me know ASAP so I can make arrangements for another coach to fill in."  (*Id.*)  In a text conversation she was having with DeForke about her bus license recertification, Lyons admits that that same night, she told DeForke "Dr. Paz said I was out of Basketball, but you can take me out of Volleyball too, that's fine with me.  Thanks."  (Ex. A, p. 120; Ex. F.)[3] [4]  Two weeks later, on August 12, 2014 DeForke sent out a revised coaching list, in part to include the new PE teacher hired to replace Lyons (Ms. Parich), and on that list Lyons was listed as only coaching track (and

---

[3] Although Lyons testified at her deposition that this text message was supposed to be sarcastic, she also admitted that based solely on the text of the message there was no way for DeForke to know that Lyons was being sarcastic.  (Ex. A, p. 121.)

[4] Lyons also testified that she was not sure she had seen DeForke's 4:49 pm email when she sent her text message at 8:19 pm.  (Ex. A, p. 117, 119-20.)  Again, there was no way for DeForke to know that Lyons (maybe) had not seen the email when she sent the text, and given that DeForke's email invited the coaches to contact her if they wanted any changes made to the schedule, it was perfectly reasonable for DeForke to assume that Lyons was with not coaching volleyball.

not basketball).  (Ex. A, pp. 122-23; Ex. G.)  It was Dr. Paz's understanding that Lyons had asked DeForke not to have to coach basketball.  (Ex. B, ¶ 7.)  Lyons admits that she thinks DeForke removed her from basketball, because DeForke thought she didn't like basketball and didn't want to coach it (Ex. A, p. 115), and because "she's the boss, she's a dictator, she can do what she wants."  (*Id*. at p. 127.)

Once Lyons took over as ISS teacher, some antagonism occurred between her and other teachers, primarily over her attempts to enforce the rule that teachers who sent students to the ISS for disciplinary reasons were supposed to send assignments for those students.  (Ex. A, p. 148; Ex. B, ¶ 16.)[5]  When teachers did not provide assignments, she was supposed to report those teachers to Dr. Paz, who would then go talk to those teachers.  (*Id*.)  Paz investigated several of Lyons' complaints that teachers were being mean to her in or around February 2015, trying not to reveal that it had been Lyons who had complained (although that was sometimes self-evident, based on the complaint).  (*Id*.)  He also held a faculty meeting to make everyone aware that the new ISS procedures came from him, and that he had requested to see the assignment page each day, to take away any pressure Lyons was feeling as well as stating his expectations to my staff.  (Ex. B, ¶ 16.)  He documented his investigation in notes, which are attached as Exhibit B-4.  Some of the teachers got upset with Lyons for reporting them, and as Dr. Paz discovered, Lyons (and in one case a friend of hers) had not helped the situation by egging on the other employees.  (Ex. B, ¶ 16.)  As Dr. Paz noted with regards to one incident, "the perception that was being communicated to other staff members was that 'Ms. Lyons and her friend were running the school.'"  (*Id*.)  Despite this, Dr. Paz did not discipline Lyons, but instead tried to mediate between her and the other employees to

---

[5] "But if [the students] were in there more than two days, you had to go one of those days. And we had to keep a chart and let him know what teachers came, what teachers didn't come, what teachers sent work, what teachers didn't send work. We had so many teachers upset with us and mad. They would come in the next day, like, 'Really, why did you tell on us?'" (Ex. A, p. 148.)

*improve her working relationships.*  (*Id.*)

Track, the only sport that Lyons was coaching for the 2014-2015 school year, does not start until around Valentines Day.  (Ex. A, p. 37.)  However, within a few weeks of starting the season, Lyons had antagonized her fellow coaches by reporting to Dr. Paz that they were not waiting outside after practice to supervise the students waiting to be picked up by their parents.  (Ex. A, pp. 131-137.)  On February 27, 2015, Lyons emailed DeForke to complain that she had been the only coach outside the prior day with both the boys and the girls for twenty minutes after practice. (Ex. A, p. 135; Ex. I.)  Lyons claims that DeForke shared that email with the head boy's track coach, to let him know of the concerns (Ex. A, p. 136), and he apparently showed it to another coach, who cut and paste a paragraph from Lyons' email and, *without attributing it to her*, shared it with the other coaches to express his opinion that the complaint did not engender the "unity" that he felt coaching squads should have:

> Coaches, these types of emails don't fix anything.  In fact, they create a hostile work environment.  They cause tension and uneasiness among staff members.  It's so much easier to 'communicate' with your fellow coaches than to attempt to stir up controversy.

(Ex. A, pp. 133-135; Ex. H.)  The male coach also responded to the allegation that the male coaches had not been outside that day, pointing out that there had been some situations the (unnamed) author of the email might not have been aware of, and claiming that the male coaches were outside. He ended his email as follows:

> In conclusion, coaches, let's do a better job of communicating with each other about what our expectations are and what we are doing. Our main goal should be about these kids, not attacking each other. Nothing gets accomplished when we use those tactics and it creates turmoil am on staff members. I'm looking forward to another great season with you guys and if there is anything you need of me please don't hesitate to ask me. I'm a total team player and I have no problem with you pointing out my deficiencies.

(Ex. H.)  However, instead of talking to her fellow coaches to try to work things out, Lyons

immediately forwarded the emails to Dr. Paz, stating "[t]his is breach of confidentiality, bulling [sic], harassment, and not going to be tolerated." (*Id.*)

Lyons also immediately conflicted with Lauren DeForke over a number of coaching-related issues.  Dr. Paz wanted to make sure that coaches did not cancel practices at the last minute, because it would catch parents off guard and potentially lead to unsupervised students hanging out on campus after school.  (Ex. B, ¶ 17.)  Lyons admits that on February 27, 2015, she was sick, so she went ahead and canceled the practice over the announcements at the end of the day (Ex. A, pp. 159-61), which caught DeForke off guard.  DeForke sent Lyons the following professional email:

> Coach Lyons,
> From now on if you would like to cancel practice, you have to get my approval. We have received numerous parent emails concerned about canceled practice so late. I had every intention to work with your athletes due to you being ill and having to leave school.
> We try really hard not to not cancel practice especially at the end of the day if we can avoid it. Thanks for your understanding.

(Ex. J.)  Unfortunately, for some reason DeForke sent Lyons the same email on Friday and Monday, and Lyons' response was to forward it to Dr. Paz and state, "Why do I need this email twice?  I am not going to be harassed and bullied by Lauren DeForke." (*Id.*)  Lyons has also complained that DeForke failed to inform her that the staff was meeting after school to discuss work or coaching (Petition, ¶ 4.14) – but DeForke told her by email on that same Friday (February 27) that "[w]e will have discussions outside when we are waiting for the kids to get picked up" (Ex. K), and that "[w]e have to come into the office to get our stuff and we usually talk about the students and what we think they will be good at.  You are welcome to join us in the office to discuss your kids also." (Ex. I.)  Lyon actually objected to this, telling DeForke that she took her things with her after school and didn't need to come into the office, and that she would not do that because "someone needs to be outside." (*Id.*)  Although Lyons implies that her conflicts with the other coaches happened multiple times throughout the school year, the evidence shows that they

really each only happened once, and almost all on February 27, 2015.  (Ex. A, p. 139-40; 159-61.)

### III.  SUMMARY JUDGMENT STANDARD

A court may terminate litigation by rendering summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A material fact issue is one that might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).  Once the party seeking summary judgment makes the initial showing, negating any disputed, material fact, the party opposed to the motion must offer evidence reflecting the existence of one or more genuine issues of material fact.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  Conclusory assertions are insufficient to raise a genuine issue of material fact precluding summary judgment.  *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991).

### IV. ARGUMENTS AND AUTHORITIES

#### A.     No Evidence of Disability Discrimination under the ADA

Lyons alleges that her reassignment from teaching PE to teaching ISS was discrimination on the basis of her disability – or perceived disability – in violation of the ADA, and her entire basis for thinking so is the voicemail that Dr. Paz left her on July 21, 2014 about the reassignment, in which he referenced "health concerns." (Ex.  A, pp. 55-57, 62; Ex. C, Response to Interrogatory No. 2.)  To establish a prima facie case of disability discrimination under the ADA, Lyons must first make a prima facie showing of discrimination, *i.e.* that (a) she is disabled, has a record of having a disability, or is regarded as disabled, (b) she is qualified for her job, (c) she was subjected to an adverse employment action on account of her disability or the perception of her disability, and (d) she was replaced by or treated less favorably than non-disabled employees.  *EEOC v. Chevron Phillips Chemical Co., LP,* 570 F.3d 606, 615 (5th Cir. 2009).  A person is disabled under the ADA if she (1) has a physical or mental impairment that substantially limits one or more of the

major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2).  The Fifth Circuit interprets this definition strictly.  *Carmona v. Southwest Airlines Co.,* 604 F.3d 848, 855 (5th Cir. 2010).

Lyons' alleged health condition was not a "physical impairment " and therefore not a disability (or perceived disability) under the ADA.  In response to an interrogatory asking for all information about her "medical condition" that required the "surgical outpatient procedure" during the summer of 2014, Lyons simply answered, "Obesity and High Cholesterol; Gastric Lap Band.  (Ex. C, Response to Interrogatory No. 6.)  However, Lyons admits that she never told Dr. Paz anything about her lap band procedure, or the "condition" that led to that procedure.  (Ex. A, pp. 57-59, 72.)  Lyons has not alleged that any weight problem that she had placed any limitations on her ability to perform her PE or coaching duties, and has testified that she had the surgery during the summer so that it would not impact her ability to do her job, and that she was in fact healthy and ready to work when she returned after the summer.  (Ex. A, p. 69.)  Dr. Paz admits that someone told him that she was having the lap band procedure after school got out for the summer, so that it would not interfere with school, but he did not know why she was having the procedure.  (Ex. B, ¶ 8, 9.)  He did not know she had high cholesterol, and he did not perceive Lyons as being obese.  (Ex. B, ¶ 9.)  Lyons had not had any problems performing her PE or coaching duties because of any problems with her weight.  (*Id.*)  As Paz explained, he simply offered the thought to Lyons in his voice message that if she needed any accommodations, the reassignment might help her, as a way of helping Lyons see the positive in a reassignment that he had already decided to make, for reasons that had nothing to do with any health issues that she might have had.  (Ex. B, ¶ 11.)

Although there is some dispute between courts, the vast majority of courts – and all circuit courts – have concluded that obesity only qualifies as a physical impairment, and therefore a

disability under the ADA, if the obesity results from an underlying physiological disorder or condition.  The leading case on this issue is *Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016), in which the Eighth Circuit analyzed the issue of whether the ADA covered obesity at length, and reached the following conclusion:

> [W]e conclude that a more natural reading of the interpretive guidance is that an individual's weight is generally a physical characteristic that qualifies as a physical impairment only if it falls outside the normal range *and* it occurs as the result of a physiological disorder. Both requirements must be satisfied before a physical impairment can be found. In other words, even weight outside the normal range— no matter how far outside that range—must be the result of an underlying physiological disorder to qualify as a physical impairment under the ADA.

*Id*. at 1108.  The Eighth Circuit noted that two other circuits – the Sixth Circuit in *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442-43 (6th Cir. 2006), and the Second Circuit in *Francis v. City of Meriden*, 129 F.3d 281, 296 (2d Cir. 1997) – reached the exact same conclusion.[6]  While the Eighth Circuit noted that those two cases pre-dated the 2008 amendments to the ADA, after an extensive analysis of the purpose and text of the amendments, the Court reached the conclusion that the 2008 amendments did not change the outcome, largely because they did not change the definition of "physical impairment."  *See id.* at 1110-12.  The Court therefore held:

> In sum, we conclude that for obesity, even morbid obesity, to be considered a physical impairment, it must result from an underlying physiological disorder or condition. This remains the standard even after enactment of the ADAAA, which did not affect the definition of physical impairment. Because Morriss failed to produce evidence that his obesity was the result of an underlying physiological disorder or condition, the district court properly concluded that Morriss did not have a physical impairment under the ADA.

*Id*. at 1112-13.  The Court also rejected the argument that BNSF violated the ADA by terminating Morriss for a "perceived disability," because "as a threshold matter, Morriss was required to show

---

[6] This is actually consistent with how the Fifth Circuit looked at the issue in 1997 in *Watters v. Montgomery County Emer. Comm. Dist*., 129 F.3d 610 (5th Cir. 1997) (unpublished), when the Court noted that "except in rare circumstances, obesity is not considered a disabling impairment."  *Id*. at *2.  That case, however, was largely decided on other grounds.

that BNSF perceived his obesity to be a condition that met the definition of 'physical impairment.'"
*Id*. at 1113. Because BNSF did not perceive Morriss to have obesity arising out of an underlying physiological disorder or condition, the plaintiff failed on his "perceived disability" claim as well.

Since the 2008 amendments to the ADA, numerous other courts have concluded that obesity must still be the result of an underlying physiological disorder or condition to count as a disability under the ADA. *See Shell v. Burlington Northern Santa Fe R.R. Co*., 2018 WL 1156249, at *3 (N.D. Ill. 2018) ("[T]his Court adopts the majority view that obesity constitutes an ADA impairment only when it results from an underlying physiological condition or disorder."); *Valtierra v. Medtronic Inc*., 232 F.Supp.3d 1117, 1125 (D. Ariz. 2017) ("Thus, a person's weight is a physical characteristic that qualifies as a physical impairment only if it (1) falls outside the normal range and (2) occurs as the result of a physiological disorder."); *Richardson v. Chicago Transit Auth*., 292 F.Supp.3d 810, 818 (N.D. Ill. 2017) ("In sum, this Court concludes that severe obesity, by itself, fails to constitute a disability under the ADA. Rather, to qualify as a protected physical impairment, claimants under the ADA must show that their severe obesity is caused by an underlying physiological disorder or condition.") *see generally Lescoe v. Penn. Dept. of Corrections*, 464 Fed.Appx. 50, 53 (3d Cir. 2012). Most of these cases also rejected "perceived disability" claims as well, largely for the same reason as *Morriss*.

Pursuant to his duty of candor to the Court, counsel for the Defendant acknowledges that although the Fifth Circuit does not appear to have directly addressed this issue since *Watters*, two district courts in the Fifth Circuit (including the Southern District of Texas) have concluded that due to the 2008 amendments, *morbid* obesity counts as a disability under the ADA, even when it is not caused by an underlying physiological disorder or condition. *McCollum v. Livingston*, 2017 WL 608665 (S.D. Tex. 2017) was not an unemployment case, but was brought by the estate of a prisoner who died in prison due to heat-related illnesses. McCollum was morbidly obese, and one

claim asserted by the plaintiffs was that the prison violated the public accommodations portion of the ADA by failing to accommodate his numerous medical conditions, including his morbid obesity.  The analysis of the ADA claim is complicated by the fact that McCollum did have several other medical conditions – including depression, hypertension and diabetes – all of which the court also noted could be disabilities under the ADA.  *See id.* at \*33-34.  However, Judge Ellison did, in discussing McCollum's obesity, note his disagreement with the cases that had held that obesity required an underlying physiological disorder or condition, and relied on a 2011 case from the Eastern District of Louisiana (*EEOC v. Res. for Human Dev., Inc.*, 827 F.Supp.2d 688, 694 (E.D. La. 2011)) and the EEOC Compliance Manual, to conclude that morbid obesity (*i.e.* body weight more than 100% over the norm) counted as a disability under the ADA, even when it is not caused by an underlying physiological disorder or condition.  *Id.* at \*35.

With all due respect to Judge Ellison, the District asserts that *Morriss* (and the other cases cited above) is the better reasoned line of authority, given that the 2008 amendments did not change the definition of "physical impairment."  Judge Ellison relied in his analysis primarily on the EEOC Compliance Manual and the 2011 Eastern District of Louisiana case (which itself relied heavily on the same Compliance Manual), but *Morriss* also considered and analyzed the same Compliance Manual, and rejected it as being inconsistent with the ADA itself:

> We first note that this Compliance Manual pronouncement directly contradicts the plain language of the Act, as well as the EEOC's own regulations and interpretive guidance, which, as previously explained, all define "physical impairment" to require an underlying physiological disorder or condition.

*Morriss*, 817 F.3d at 1112.  Several other courts have also rejected the EEOC Compliance Manual's position on this issue.  *See*, *e.g*., *Richardson*, 292 F.Supp.3d at 818 (citing, among other cases, *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 449 n.9, 123 S.Ct. 1673 (2003) (noting that "the EEOC's Compliance Manual is not controlling" though it may offer a "body of

experience" to which courts "may resort for guidance") (citation omitted)).  Under *Morriss*, Lyons'

obesity would constitute neither an actual nor a perceived disability, because she has neither

alleged nor provided any evidence that her obesity resulted "from an underlying physiological

disorder or condition."  *Morriss*, 817 F.3d at 1112-13.

However, even under the *McCollum* and *Human Development* cases, Lyons' ADA claim

would still fail, because those cases both held that obesity is only a disability if the plaintiff is

morbidly obese, *i.e.* more than 100% over normal body weight.  *See McCollum*, 2017 WL 608665

at *35;  *Human Development*, 827 F.Supp.2d at 694.  Lyons has never alleged, nor provided

evidence, that she was morbidly obese.  (Ex. C, Response to Inter. No. 5.)  Unlike most of the

cases above, where from the facts it is clear that everyone knew that the plaintiffs at issue were

morbidly obese, and where their obesity was having some impact on their job performances, here

Dr. Paz did not perceive Lyons as being obese, nor did he believe that her weight was having any

impact on her performance as either a PE teacher or a coach.  (Ex. B, ¶ 8, 9.)

Additionally, Lyons has not alleged, nor has she presented evidence, that her obesity

"substantially limited" – or had any impact at all – on any of her major life activities, including

working.  The Fifth Circuit has held that, "[a]lthough the ADA Amendments Act of 2008 lowered

the standard that plaintiffs must meet to show that they are disabled, a plaintiff must still show

substantial limitation." *Mann v. Louisiana High School Athletic Association,* 2013 WL 2475116

at *4 (5th Cir., July 11, 2013) (unpublished) (citing ADA Amendments Act of 2008). There is also

no evidence that Dr. Paz (or anyone else) perceived Lyons as being substantially limited in any

way.  A person is not "regarded as" disabled if her impairment is "transitory and minor."  42 U.S.C.

§§ 12102(1)(C), 3(1)(B).  "A transitory impairment is an impairment with an actual or expected

duration of 6 months or less." *Id.; see also Weems v. Dallas Indep. Sch. Dist.*, 260 F.Supp.3d 719

(2017).  Lyons testified that her obesity did not impact her performance prior to the surgery, and

that by the end of the summer she was healthy and ready to return work.  (Ex. A, p. 69.)

Even assuming for the sake of argument that Lyons could establish that she had a disability,

Lyons did not suffer an adverse employment action by being reassigned from the PE position to

the ISS position at MCJH.  In analogous cases under Title VII and the First Amendment retaliation

rubric, the Fifth Circuit has repeatedly held that a reassignment is not a per se adverse action, but

will only be seen as adverse "if the transfer is "objectively 'equivalent to' one of the commonly

accepted adverse actions (e.g., discharges, demotions, or reprimands)." *Burnside v. Kaelin*, 773

F.3d 624, 627 (5th Cir. 2014) (citing *Serna v. City of San Antonio,* 244 F.3d 479, 483 (5th Cir.

2001)); *see also Alvarado v. Texas Rangers*, 492 F.3d 605, 613–14 (5th Cir. 2007);  *Pegram v.*

*Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004).  As the Fifth Circuit has noted:

> However, it is insufficient for a plaintiff to show merely that he has been transferred
> from a job he likes to one that he considers less desirable. Rather, a plaintiff must
> produce enough evidence to allow a reasonable trier of fact to conclude that, when
> viewed objectively, the transfer caused harm to the plaintiff, "sufficiently serious
> to constitute a constitutional injury." *Breaux*, 205 F.3d at 152.

*Serna*, 244 F.3d at 483.  Whether the new position is worse is an objective inquiry. *Pegram,* 361

F.3d at 283. "[A] plaintiff's subjective perception that a demotion has occurred is not enough."

*Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir. 1996).  Lyons has not offered evidence

to show that the ISS position was objectively "demotion-like."  In his Level 1 decision on Lyon's

grievance, Dr. Paz stressed that "[t]his change of assignment to ISS  should in no way be construed

as a demotion," (Ex. B, ¶ 13; Ex. B-2), and pointed out his belief in the importance of the position:

> In fact, you are now in a supervisory role for this new position.  You facilitate the
> rotation of several teachers in In School Suspension, as well as the management of
> the paraprofessional assigned to ISS. You are also directly responsible for every
> student who is assigned to ISS and in direct communication with administration.
> When we utilized a long term substitute in ISS for the spring semester, it was not
> effective and discipline concerns increased. This is why I need an established coach
> who can help improve the program and minimize discipline reoccurrences. You are
> an important part of this improvement process.

(Ex. B-2.)  Moreover, Lyons herself admitted that she was happy with the reassignment in her

Level 2 grievance.  (Ex. A, pp. 91-92; Ex. B-3 ("I'm happy with what's going on, I'm happy with where I'm at.")).  For the foregoing reasons, summary judgment should be granted on Plaintiff's discrimination claim under the ADA.

**B.**  **No Retaliation under the ADA**

To make a *prima facie* case of retaliation under the ADA, Lyons must show that: (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *See, e.g., Bennett v. Calabrian Chems. Corp.,* 324 F.Supp.2d 815, 838–39 (E.D. Tex. 2004) (ADA retaliation). Protected activity under these statutes includes opposing a discriminatory practice, and making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under the statutes.  42 U.S.C. § 2000e–3; 42 U.S.C. § 12203.

Lyons cannot make out an actionable claim for retaliation, because the "retaliation" she complains of does not rise to the level of "adverse employment actions" under the ADA, and she admits that the acts she complains about were not the result of any complaints she made about discrimination , but were the results of her ongoing poor relationship with Lauren DeForke (which pre-dated her complaints about discrimination), and her deteriorating relationships with the other teachers and coaches.  While it is true that the definition of "adverse employment action" for purposes of retaliation claims under Title VII is a little broader than the same term for purposes of discrimination claims, *see Burlington Northern and Santa Fe Railway Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405 (2006),[7] the Supreme Court has explained that the plaintiff still must show that any such "retaliatory acts" would "have dissuaded a reasonable worker from making or supporting a

---

[7] "Retaliation claims are treated the same whether brought under the ADA or Title VII." *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir. 1997).  The *Burlington Northern* standard for retaliation under Title VII also applies to retaliation claims under the ADA.  *See, e.g., Adams v. Anne Arundel Cty. Pub. Sch.,* 789 F.3d 422, 431 (4th Cir. 2015).

charge of discrimination."  *Id*. at 68 (internal quotation marks and citation omitted). Whether a

particular employment action is materially adverse "depends upon the circumstances of the

particular case, and should be judged from the perspective of a reasonable person in the plaintiff's

position, considering all the circumstances." *Id*. at 71 (internal quotation marks and citation

omitted).  An action must be "materially adverse" because it is important to separate significant

from trivial harms. *Id.* The action is judged from the standpoint of a reasonable employee because

the standard for judging harm must be objective. *Id.* The standard is general because the

significance of any given act of retaliation will often depend upon the particular circumstances;

"[c]ontext matters." *Id.*

In *Burlington Northern*, the Court clarified that "[t]he antiretaliation provision protects an

individual not from all retaliation, but from retaliation that produces an injury or harm."

*Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415.  The Court held:

> An employee's decision to report discriminatory behavior cannot immunize that
> employee from those petty slights or minor annoyances that often take place at work
> and that all employees experience. The antiretaliation provision seeks to prevent
> employer interference with "unfettered access" to Title VII's remedial mechanisms.
> It does so by prohibiting employer actions that are likely "to deter victims of
> discrimination from complaining to the EEOC," the courts, and their employers.
> And normally petty slights, minor annoyances, and simple lack of good manners
> will not create such deterrence.

*Id*.  Lyon's problem is that the "retaliatory acts" about which she complains do not meet this

standard – in addition to suffering serious causation problems as well.  In Interrogatory No. 9,

Lyons was asked to state her factual basis for her retaliation claim, including how she believed she

was retaliated against.[8]  The District has numbered her paragraphs for ease of reference.  (*See* Ex.

C, Response to Interrogatory No. 9.)  In paragraph 2, Lyons complains that DeForke changed the

---

[8] At her deposition, Lyons was asked if her Response to Interrogatory No. 9 listed all the ways she believed she had been retaliated against, and she stated that other than a general change in what she called the "family atmosphere" in her group after DeForke took over, she agreed that it was all that she could think of. (Ex. A, p. 113.)

---

sports she was coaching "multiple times" for the 2014-15 school year. She admitted at her deposition, however, that this really only happened twice over a two-week period, in the July 30, 2014 and August 12, 2014 emails that DeForke sent out to all the female coaches when setting the coaching schedule for the year. (Ex. A, p. 127.) First, Lyons offers no legal authority that a change in coaching position would constitute an "adverse employment action." *See*, *e.g*., *Lucero v. Nettle Creek School Corp*., 566 F.3d 720, 729-30 (7th Cir. 2009) (change in grade level assignment not adverse employment action). Second, there is no evidence that DeForke, who made the coaching decisions (Ex. B, ¶ 7), knew about Lyons' complaints about discrimination to Dr. Paz, and particularly when she removed Lyons from coaching volleyball on July 30, 2014, which predated Lyons' grievance and was only two days after Lyons' first email to Paz about the reassignment. Lyons admits that she did not talk to DeForke about the complaints she made to Dr. Paz about discrimination, prior to being removed from volleyball on July 30. (Ex, A, p. 116.) It is axiomatic that a governmental entity cannot retaliate against someone for protected conduct if the relevant decisionmaker did not know about the relevant conduct.[9] But more importantly, Lyons admits that she does not think it was her complaint about discrimination that led to her removal from volleyball, but was instead DeForke getting back at her for their dispute over how the 7C team should serve. (Ex. A, pp. 114-15.) She admits that she thinks DeForke then removed her from coaching basketball, because DeForke thought she didn't like basketball and didn't want to coach it (Ex. A, p. 115), and because "she's the boss, she's a dictator, she can do what she wants." (*Id*.

---

[9] *See*, *e.g*., *Cabrol v. Town of Youngsville*, 106 F.3d 101, 108 (5th Cir. 1997); *Balakrishnan v. Bd. of Supervisors*, 2011 WL 6003312, at *4 (5th Cir. 2011) ("An employer cannot engage in a retaliatory action if at the time of the alleged action it does not know about an employee's protected conduct."); *Walker v. Geithner*, 400 Fed.Appx. 914, 917 (5th Cir. 2010) ("Walker cannot establish a *prima facie* case of retaliation, because there is no evidence that his employers were aware of his protected activity, so there is no causal link."); *Sherrod v. American Airlines, Inc*., 132 F.3d 1112, 1122 (5th Cir. 1998) ("In order to establish the causal link between the protected conduct and the illegal employment action as required by the prima facie case, the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity.")

at p. 127.)[10]  Even if these coaching changes were "retaliation" by DeForke, they were not "retaliation" based on Lyons' complaints about discrimination or otherwise protected conduct under the ADA.

In paragraph 4 and 5, Lyons complains that for the 2015-16 school year, her coaching evaluator was changed to Chris White, the Athletic Coordinator. (Ex. A, p. 140.)  The Fifth Circuit has noted that not all negative write-ups by a supervisor constitute adverse employment actions for purposes of a retaliation claim.[11]  If this is true, then being reassigned to an evaluator who Lyons admits was more likely to be fair to her than her previous evaluator (DeForke), and who gave her good evaluations (Ex. A, pp. 140-42), cannot be adverse.

In paragraph 6, Lyons complains that over the course of several school years, Dr. Paz made some changes to the structure of the ISS program, including how many "duty teachers" rotated through the classroom each day.  (Ex. A, p. 144-147.)  Dr. Paz has testified that these changes were the results of cuts to the school's budget, and his need to move staff around to get the best out of fewer teachers.  (Ex. B, ¶ 14.)  Lyons admits that these changes were made for each upcoming school year (Ex. A, p. 147),  and making changes to how a program is run, especially when done to accommodate budget cuts, is not an adverse employment action for purposes of a retaliation claim:

> The filing of EEOC complaints does not utterly insulate a member of a university faculty from unfavorable administrative changes to courses or programs. The definition of adverse employment action, while it is not limited merely to direct and

---

[10] Lyons also admits that when she was moved to coaching tennis for the 2015-2016 school year (paragraph 3), that was because the other coaches wanted her out because they were mad at her for reporting them for not supervising students after school.  (Ex. A, pp. 127-138.)

[11] See, e.g., Grice v. FMC Techs. Inc., 216 F. App'x 401, 404 (5th Cir. 2007) (allegations that an employee was watched more closely than others, that he was wrongly accused of forging a signature, and that his supervisor falsified an incident report to make it look like the incident was his fault, were not adverse for purposes of a Title VII retaliation claim); Earle v. Aramark Corp., 247 Fed.Appx. 519, 524 (5th Cir. 2007) (disciplinary writeups and alleged retaliatory micro-managing of plaintiff's performance did not constitute materially adverse employment actions); DeHart v. Baker Hughes Oilfield Operations, 214 Fed.Appx. 437, 442 (5th Cir. 2007) (alleged retaliatory written warnings would not have dissuaded a reasonable worker from making or supporting a charge of discrimination).

---

> obvious changes in the conditions of employment such as demotion, does not
> encompass any action whatsoever an organization might take which discomfits or
> inconveniences a person engaging in protected activity … For a college, as here, to
> periodically review the curriculum of required courses and make moderate
> alterations is, in the words of the *Mitchell* court, "properly considered good
> institutional administration rather than a materially adverse employment action." .

*Szeinbach v. Ohio State Univ.*, 758 F. Supp. 2d 448, 472 (S.D. Ohio 2010), *aff'd in relevant part,* 493 F. App'x 690 (6th Cir. 2012) (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)). When asked why she thought anyone was trying to get her to leave by changing the ISS program, Lyons told a very long story about how things had changed and people didn't socialize as much anymore (Ex. A, p. 150-52), and then concluded with the fact that Lauren DeForke hadn't liked her going all the way back to when she was a substitute teacher in 2011. (Ex. A, p. 153.)  Again, this had nothing to do with any complaints about discrimination.

In paragraphs 7 and 8, Lyons complains that at two different times, Dr. Paz asked her in private if she wanted to get out of her dual coaching contract (para. 7) or be placed on the excess list[12] (para. 8); in both cases she said "No," and nothing ever came of those conversations.  (Ex. A, p. 154-158.)  In *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577 (S.D. Tex. 2015), this Court held that a supervisor telling an employee that he was "going to make her life a living hell," and that "it was nice knowing you," after telling the employee that she was scheduled for a disciplinary meeting, were not adverse employment actions for purposes of a Title VII retaliation claim, because "[t]hreats of retaliation that do not significantly alter conditions of employment are generally not enough for a *prima facie* Title VII case."  *Id*. at 586; *see also Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 (2d Cir. 2011) (schedule changes and verbal threats are not materially adverse employment actions supporting a Title VII retaliation claim).  If

---

[12] The "excess list" is a list of employees whose positions are being eliminated due to position cuts; as Lyons understood it, those employees on the list would be guaranteed jobs somewhere in the District, but with no control over where that job might be.  (Ex. A, p. 157.)

those kinds of specific threats are not adverse for purposes of a retaliation claim, then merely asking if an employee is she wants to change her contract status or transfer to another school, with no further action, cannot be adverse.

Ultimately Lyons' retaliation claim fails, because the "retaliation" she complains of does not rise to the level of "adverse employment actions" under the ADA, and she admits that the acts she complains about were not the result of any complaints she made about discrimination, but were the results of her ongoing poor relationship with DeForke, and her deteriorating relationships with the other teachers and coaches.  To the extent that Lyons complains that DeForke and the other coaches and teachers treated her badly – such as forwarding her emails to others,[13] not including her in after-school conversations about the students, and requiring her to get DeForke's approval before she canceled practices[14] (*see* Petition, ⁋ 4.14) -- as discussed at length above, Lyons has admitted that this was not because she complained about discrimination, but because she reported them for not doing their coaching jobs (in her opinion), or not turning in ISS assignments, and thus they were not happy that she got them in trouble with Dr. Paz.  (Ex. A, pp. 137-38.)  Her troubles with DeForke long pre-date any complaints she made about discrimination, and her dispute with DeForke in 2014 stemmed from their argument over how the 7C volleyball teams should serve the ball.  (Ex. A, pp. 114-15.)

But even if Lyons were to allege that her treatment by DeForke and her co-workers was somehow tied to her complaints about discrimination, her retaliation claim would still fail, because the courts have routinely held that generalized mistreatment and ostracism by co-workers and even

---

[13] Although Lyons claimed that she thought there were other emails that had been forwarded, the one that DeForke sent to the boy's track coach to share Lyons' concerns with him was the only one she could specifically identify.  (Ex. A, pp. 139-40.)

[14] Again, this only happened once, on March 2, 2015, after Lyons admitted that she canceled practice over the announcements at the end of the school day because she was sick. (Ex. A, pp. 159-61.)  The only specific example Lyons could think of of a teacher canceling practice without permission happened a full year later, when she coached tennis in the spring of 2016.  (Ex. A, pp. 161-62.)

supervisors is not actionable retaliation.   In *Aryain v. Wal-Mart Stores*, 534 F.3d 473, 480 (5th Cir. 2008), the plaintiff complained that after she had complained to her supervisors about a co-workers' sexual harassment of her, the supervisors changed their attitude towards her and retaliated against her by reassigning her to an area where she had to break down clothing racks in the heat, denied her breaks, watched her on the security cameras, looked at her angrily, and laughed at her and talked about her negatively.  The Fifth Circuit held that even under *Burlington Northern*, as a matter of law "these allegations do not rise to the level of material adversity.  Instead they fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that employees regularly encounter in the workplace, and which the Supreme Court has recognized are not actionable retaliatory conduct."  *Aryain*, 534 F.3d at 484-86 (quoting *Burlington Northern*, 548 U.S. at 68).[15]

        In most of the cases cited above, the plaintiffs claimed that they were ostracized by co-workers and supervisors as a result of the discrimination complaints that they made, but the various courts ruled that the behavior, unpleasant as it might be, did not rise to the level of actionable adverse employment.  Here, Lyons admits that it was not her complaints about discrimination that soured her co-workers towards her – there is no evidence that any of them even knew about her complaints – but instead, that it was her complaints about their failure to be outside after practices to supervise students, and their failure to turn in assignments for their students in ISS, that led to

---

[15] *See also Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 331-32 (5th Cir. 2009) (personal items being taken from a desk; locks on an office being changed; not being allowed to close office door; and being chastised by superiors and ostracized by co-workers not retaliation as a matter of law); *King v. Louisiana*, 294 Fed.Appx. 77, 85 (5th Cir. 2008) ("allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation."); *Honor v. Booz-Allen & Hamilton, Inc*., 383 F.3d 180, 189 (4th Cir. 2004) ("Honor's remaining allegations involve a negative employment evaluation he received and the fact that he was ostracized by certain employees.  Neither claim rises to the level of an adverse employment action."); *Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261, 271-72 (4th Cir. 2001) ("Matvia's claim of retaliation based on the uncivility of co-workers, most of which constituted refusals to speak to her, must fail because Matvia cannot establish that she suffered adverse employment action."); *Soublet v. Louisiana Tax Com'n*, 766 F.Supp.2d 723, 734-35 (E.D. La. 2011) ("The Court finds that plaintiff's complaints of increased or altered supervision, criticism and documentation, even when considered together, would not dissuade a reasonable worker from making or supporting a charge of discrimination.")

---

many of the things about which she complains.  For the foregoing reasons, summary judgment should be granted on Plaintiff's retaliation claim under the ADA

## C.    No Hostile Environment under the ADA

Assuming that Lyons is asserting a claim for disability-based hostile environment that is separate and apart from her retaliation claim, to succeed on a claim of disability-based harassment, Lyons must prove "(1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001) (citing *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir. 1998)).  The disability-based harassment must "be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment."  *Id*.

When asked to explain how she suffered a hostile environment that was based on her disability or perceived disability, Lyons repeated many of the incidents discussed above – including not being transferred off the MCJH campus, being asked to tell on teachers when they did not send work for their students to the ISS, "teachers being upset with being told on and verbalizing it to me," and people ignoring her in the halls.  (Ex. A, p. 167; Ex. C, Response to Interr. No. 10.) However, despite being asked three times, Lyons could not explain how any of these acts, unpleasant or "hostile" as they may have been, had anything to do with her disability, perceived disability, or complaints about discrimination.  (Ex. A, pp. 167-69.)  The best she could come up with was, "[t]his is the hostility that happened to me."  (*Id*. at p. 169.)  Because any hostility that Lyons faced had nothing to do with her disability (or perceived disability), as discussed above, she cannot make out a claim for a disability-based hostile environment.

## V.  CONCLUSION

For the reasons given above, Defendant Katy ISD prays that the Court deny and dismiss the claims asserted by Lyons against it; that the Plaintiff take nothing by this action; that the District recover its costs and reasonable attorneys' fees; and that the District receive such other and further relief; both at law and in equity, to which it has shown itself justly entitled.

Respectfully Submitted,

THOMPSON & HORTON LLP

By: _____
       Christopher B. Gilbert
       State Bar No. 00787535
       Southern District No. 17283

3200 Southwest Freeway, Suite 2000
Houston, Texas  77027
Telephone:  (713) 554-6744
Facsimile:   (713) 583-7698
E-mail:  cgilbert@thompsonhorton.com

ATTORNEYS FOR DEFENDANT KATY ISD

OF COUNSEL:

Benjamin P. Wells
State Bar No. 24093341
Southern District No. 2714226
THOMPSON & HORTON LLP
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, Texas 77027
Telephone:     (713) 554-6751
bwells@thompsonhorton.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on counsel of record at the address below by electronic service on August 10, 2018:

Ellen Sprovach
ROSENBERG & SPROVACH
3518 Travis, Suite 200
Houston, Texas 77027
ellen@rosenberglaw.com


_____
Christopher B. Gilbert